UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANCISCO VEGA, JR.,<br><br>          Plaintiff,<br><br>     v.<br><br>M. SOTO, et al.,<br><br>          Defendants. | No. 1:22-cv-00471-JLT-EPG (PC)<br><br>FINDINGS AND RECOMMENDATIONS RECOMMENDING THAT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BE DENIED<br><br>(ECF No. 134)<br><br>OBJECTIONS, IF ANY, DUE WITHIN THIRTY (30) DAYS |

## I. INTRODUCTION

Plaintiff Francisco Vega, Jr. is a state prisoner proceeding *pro se* in this civil rights action filed pursuant to 42 U.S.C. § 1983. This case proceeds on Plaintiff's First Amendment retaliation claims against Defendants Soto, Borba, and Noujaime, stemming from Plaintiff's allegations that Defendants took a series of adverse actions against him in retaliation for filing prison grievances about Defendants' conduct.

On October 24, 2024, Defendants filed a motion for summary judgment, arguing that their "actions were not retaliatory" but "were in furtherance of legitimate penological goals," that Plaintiff has no evidence to support his claims, and that they are otherwise entitled to qualified immunity. (ECF No. 134-1, p. 7).

After extending the time for Plaintiff to respond, Plaintiff filed an opposition on January 8, 2025, arguing that Defendants' own statements, the timing of events, and evidence from

1

witnesses creates genuine issue of material fact precluding summary judgment. (ECF No. 139). Further, he argues that Defendants are not entitled to qualified immunity.

Defendants filed their reply on January 22, 2025, and this matter is now ripe for decision. (ECF No. 143).

For the reasons given below, the Court recommends denying Defendants' motion for summary judgment.

## II.  BACKGROUND

Plaintiff's operative complaint is his verified first amended complaint filed on July 5, 2022.[1] (ECF No. 14). He alleges as follows.

The events at issued occurred while Plaintiff was imprisoned at Valley State Prison (VSP) where Defendants are correctional staff. On September 24, 2020, Borba broke Plaintiff's battery charger and signal booster. On October 5, 2020, Borba admitted doing so. On October 15, 2020, Plaintiff filed a grievance (VSP-A-50294) over the incident. On February 4, 2021, Plaintiff filed another grievance (VSP-A-86190) about the way Borba and Soto had been "targeting him."[2] (ECF No. 1, p. 8). As will be discussed later, Plaintiff's allegations about being "targeted" relate to searches of his cell.

"On June 24, 2021, Defendant Noujaime kept squeezing Plaintiff's testicles on Defendant Borba's orders, which is a sexual act on Noujaime's part." (*Id.*). Accordingly, on June 25, 2021, Plaintiff filed a grievance (VSP-A-133244) against Noujaime and Borba for sexual harassment.

"On July 29, 2021, Defendant Soto informed Plaintiff that he was going to set him up with fake confidentials to justify placing him in Ad-Seg for filing grievances and PREA charges against his staff[]. Then he would file a fake RVR and have him shipped away from his family." (*Id.*). However, Soto told Plaintiff "that he could make all this go away, if he g[a]ve up any staff member for contrabands. Plaintiff stated [that he had] no information." (*Id.*).

Also "[o]n July 29, 2021, Defendants Borba and Noujaime both agreed by the shaking of

---

[1] As Plaintiff notes in his opposition (ECF No. 139, p. 9), a verified complaint may be considered as evidence for purposes of summary judgment. *See Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995) ("A verified complaint may be used as an opposing affidavit under Rule 56 . . . [if it is] based on personal knowledge and set[s] forth specific facts admissible in evidence.").

[2] For readability, minor alterations, such as altering punctuation, have been made to some of Plaintiff's quotations without indicating each change.

2

their head[s] that nobody here is going to say anything differen[t] on what Defendant Soto said" regarding setting Plaintiff up. (*Id.*). "Defendant Borba stated, 'we going to get him' and Defendants Borba and Noujaime started mocking Plaintiff on writing previous 602s and Defendant Borba stated no one is going to believe you when we set your ass up, and Defendant Noujaime started giving Plaintiff 602 forms." (*Id.*).

On August 15, 2021, Plaintiff received an RVR, authored by Soto, for "Constructive Possession of a Cellular Telephone, in which he lost 90 days of credit." (*Id.*). The RVR was issued in retaliation for the grievances (VSP-A-50294, VSP-A-86190, VSP-A-133244) that Plaintiff had filed.

Plaintiff states that Defendants placed him in "Ad-Seg" and had him transferred from VSP. (*Id.* at 10). There are "drastic differences between facility C and Ad-Seg," as well as between facility C and Plaintiff's current facility, SATF. (*Id.*).

On July 12, 2022, the Court screened the complaint and found that Plaintiff's only claims—his First Amendment retaliation claims against Defendants Soto, Borba, and Noujaime—should proceed past screening (ECF No. 15, p. 7).

### III.   SUMMARY OF THE PARTIES' BRIEFING

In their motion for summary judgment, Defendants argue that none of the actions at issue in this case were retaliatory, but they were instead related to legitimate penological goals. Generally, they contend that they properly conducted an investigation into the source of cell phones brought into VSP, which Plaintiff was suspected to have been behind.

> First, the searches from October 2020 to February 21, were conducted for the legitimate penological goal of locating cell phones and other contraband. Second, Defendant Borba and Noujaime's June 24, 2021 clothed body search of Vega, was conducted to locate contraband, in furtherance of a legitimate penological purpose and was not retaliatory. Third, Defendant's search of Vega's cell on July 29, 2021, was not retaliatory because the Defendants learned cell phones had been found at Vega's place of employment. Fourth, Defendant Soto's Rules Violation Report (RVR) issued against Vega, was not retaliatory because the Defendants investigation concluded Vega was in constructive possession of cell phones and due process was afforded Vega during the RVR hearing. Fifth, Defendant Soto's decision to place Vega in Administrative Segregation was not retaliatory because his decision was conducted for the legitimate penological purpose of maintaining security and for Vega's safety.
>
> All incidences of alleged retaliation are based upon Vega's admitted speculation,

3

>without any evidence. Finally, all the events alleged to be retaliatory were in fact the result of an investigation into Vega's involvement in introducing mobile cell phones into CDCR facilities. For all these reasons, Vega's claims fail.

(ECF No. 134-1, p. 7).

Additionally, Defendants argue that they are entitled to qualified immunity. (*Id.* at 24). In support of their motion, Defendants attach Plaintiff's deposition transcript, the deposition transcript of Javier Robles (an inmate at VSP at the time of the incidents in the complaint), their own declarations, and a statement of undisputed facts.

Plaintiff's opposition argues that he has evidence demonstrating the existence of a genuine issue of material fact. (ECF No. 139). Among other things, he argues that Defendants' own statements, the timing of events, and evidence from witnesses demonstrates that Defendants took adverse actions against him because he filed grievances against them. And primarily relying on *Rhodes v. Robinson*, 408 F.3d 559 (9th Cir. 2005), he argues that it was clearly established well before the events at issue that Defendants' alleged conduct violated his right to be free from retaliation.

In support of his motion, Plaintiff provides, among other things, a combined opposition brief/declaration, discovery responses, his deposition transcript (the same one Defendants provided), Javier Robles' deposition transcript (the same one Defendants provided), the deposition transcript of Jonathan Miller (an inmate at VSP at the time of the incidents in the complaint), the deposition transcript of Martin Herroz (a vector control technician at VSP at the time of the incidents in the complaint), RVR documents, a grievance document, and documents regarding the undisputed facts in the case.

### IV.  LEGAL STANDARDS

#### A. Motion for Summary Judgment

Summary judgment in favor of a party is appropriate when there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Albino v. Baca*, 747 F.3d 1162, 1169 (9th Cir. 2014) (*en banc*) ("If there is a genuine dispute about material facts, summary judgment will not be granted."). A party asserting that a fact cannot be disputed must support the assertion by

>citing to particular parts of materials in the record, including depositions,

4

> documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials, or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). If the moving party does so, "the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial," which is not a light burden, the party "must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." *Id.*; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322. Additionally, "[a] summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

In reviewing the evidence at the summary judgment stage, the Court "must draw all reasonable inferences in the light most favorable to the nonmoving party." *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 942 (9th Cir. 2011). It need only draw inferences, however, where there is "evidence in the record . . . from which a reasonable inference . . . may be drawn"; the Court need not entertain inferences that are unsupported by fact. *Celotex*, 477 U.S. at 330 n. 2 (citation omitted). In reviewing a summary judgment motion, the Court may consider other materials in the record not cited to by the parties but is not required to do so. Fed. R. Civ. P. 56(c)(3); *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026,

1031 (9th Cir. 2001).

## B. Retaliation

Plaintiff's retaliation claims fall within the framework of the First Amendment. *Hines v. Gomez*, 108 F.3d 265, 269 (9th Cir. 1997) (noting that claim of false charge infringing on prisoner's right to file prison grievances properly fell under the First Amendment's retaliation framework).

> Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal.

*Rhodes*, 408 F.3d at 567–68 (footnote and citations omitted). To prevail on a retaliation claim, a plaintiff may "assert an injury no more tangible than a chilling effect on First Amendment rights." *Brodheim v. Cry*, 584 F.3d 1262, 1269-70 (9th Cir. 2009). Furthermore, "a plaintiff does not have to show that 'his speech was actually inhibited or suppressed,' but rather that the adverse action at issue 'would chill or silence a person of ordinary firmness from future First Amendment activities.'" *Id.* at 1271 (citing *Rhodes*, 408 F.3d at 568–69) (emphasis in original). "Evidence of his motive may include: (1) proximity in time between the protected conduct and the alleged retaliation; (2) defendant's expressed opposition to the protected conduct; and (3) other evidence showing that defendant's reasons for the challenged action were false or pretextual." *Barth v. Montejo*, No. 2:19-CV-1874 DB P, 2020 WL 73407, at *2 (E.D. Cal. Jan. 7, 2020).

While prisoners have no freestanding right to a prison grievance process, *see Ramirez v. Galaza,* 334 F.3d 850, 860 (9th Cir.2003), "a prisoner's fundamental right of access to the courts hinges on his ability to access the prison grievance system," *Bradley v. Hall,* 64 F.3d 1276, 1279 (9th Cir. 1995), *overruled on other grounds by Shaw v. Murphy,* 532 U.S. 223, 230 n.2 (2001). Because filing administrative grievances and initiating civil litigation are protected activities, it is impermissible for prison officials to retaliate against prisoners for engaging in these activities. *Rhodes,* 408 F.3d at 567. And prison officials cannot use otherwise legitimate penological interests "as a cover or a ruse to silence and punish [a prisoner] because he filed grievance." *Bruce v. Ylst*, 351 F.3d 1283, 1289 (9th Cir. 2003).

### V. UNDISPUTED FACTS

The Court finds the facts listed below material and undisputed for purposes of summary judgment. (*Compare* ECF No. 134-6; 143 (Defendants' documents concerning undisputed facts) *with* ECF No. 140 (Plaintiff's documents regarding undisputed facts)). As will be seen, the parties only agree that a basic timeline of events occurred.

Plaintiff was incarcerated at VSP during the events at issue where Defendants were Investigative Services Unit (ISU) officers.

On September 24, 2020, Borba searched Plaintiff's cell and allegedly broke Plaintiff's battery charger and signal booster. Plaintiff filed a grievance (VSP-A-50294) about the incident on October 15, 2020, which was granted, leading Plaintiff to receive a replacement battery charger.

On February 4, 2021, Plaintiff filed another grievance (VSP-A-86910) alleging that ISU "harassed" and "targeted" him by conducting multiple searches of his cell. The Office of Appeals found no improper purpose behind the searches.

On June 25, 2021, Plaintiff filed another grievance (VSP-C-1333244) alleging Noujaime grabbed and fondled his genitals during a search.

On June 20, 2024, former inmate Javier Robles testified that he was the one who placed the cell phones in the Plant Ops cart on July 27, 2021.

Additionally, the parties generally agree that Plaintiff was charged in an RVR with constructive possession of a cellular telephone, was placed in the Administrative Segregation Unit (ASU), was found guilty of the RVR, and was ultimately transferred to another facility.

### VI. ANALYSIS

This case centers on certain actions that Defendants took—searching Plaintiff's cell and person, filing an RVR against him, placing him in ASU, and transferring him—purportedly because Plaintiff filed grievances against them.

Defendants argue that all these actions had a legitimate penological purpose and Plaintiff has no evidence otherwise. Plaintiff counters that he has evidence to show that these actions were retaliatory.

7

As Defendants have the initial burden of establishing that the record reveals no genuine issues of material fact, the Court begins with their evidence.

### A. Defendants' Evidence

#### 1. Searches of Plaintiff's Cell and Person

The parties agree that, on September 24, 2020, Borba searched Plaintiff's cell and that Plaintiff's battery charger was broken.[3] On October 15, 2020, Plaintiff filed a grievance about the incident, which was granted, leading him to receive a replacement charger. Plaintiff contends that this grievance led to a series of retaliatory actions by Defendants, beginning with searches of his cell.

ISU searched Plaintiff's cell approximately five times between October 2020 and February 2021. Defendants describe those searches as follows:

> Searching Vega's cell approximately once a month between October 2020 and February 2021 is a normal prison occurrence, not evidence of retaliation. And the searches were performed because Defendants reasonably suspected Vega was bringing contraband cellphones into the prison, not because of a grievance about a broken charger. Importantly, the first search occurred before Vega even filed his first grievance, showing the investigation was initiated for legitimate reasons and not as a retaliatory pretext.
>
> . . . .
>
> Vega testified that it is standard for officers to conduct cell searches multiple times a day. (DUF 7.) Between October 2020 and February 2021, Defendant Borba and Soto searched the cells of multiple inmates in order to locate cell phones that were being distributed at VSP. (DUF 10.) The Defendants searched the cells of all suspected inmates and did not focus only on Vega. (*Id.*) Defendants Borba and Soto had information that indicated Vega may be in possession of cell phones, and his cell was searched in the same manner as all other inmates. (DUF 10.) Defendants Borba and Soto were also aware that Vega was issued an RVR for possession of cell phone in June, 2020. (DUF 11.) As part of their investigation, ISU searched the cells of multiple inmates, including Vega. (*Id.*)
>
> . . . .
>
> Vega believed that he was being targeted for the searches. However, his belief is

---

[3] The parties differ on whether Borba broke Plaintiff's battery charger during this search. Plaintiff says he did (ECF No. 139, p. 6), and Borba states that he does not recall breaking the battery charger (ECF No. 134-3, p. 2).Ultimately, whether Borba broke the charger is immaterial for purposes of summary judgment; however, the Court notes that the grievance response that granted Plaintiff a new charger appears to concede that at least one ISU member broke Plaintiff's charger: "You, Claimant Vega, were issued a replacement battery charger on December 7, 2020, to replace the damaged battery charger that was damaged by ISU staff on September 24, 2020." (ECF No. 14, p. 16).

8

> speculative and unsupported by evidence. Inmate grievances are submitted by being placed in a confidential lockbox and collected by the grievance office. (DUF 30.) A staff member will not be notified that a grievance was made against them unless they are interviewed. (*Id.*) Defendants would not have been immediately notified that Vega filed a grievance against them. The Defendants would not have been aware of inmate grievances when they conducted their investigations.

(ECF No. 134-1, pp. 14, 15, 16).

Because of the cell searches, Plaintiff filed a grievance (VSP-A-86910) on February 4, 2021, alleging that ISU "harassed" and "targeted" him. The Office of Appeals found no improper purpose behind the searches.

On June 24, 2021, Borba and Noujaime conducted a search of four inmates, including Vega. (*Id.* at 16). According to Defendants, the search of Plaintiff's person went as follows:

> After conducting a pat down search of Vega, Defendant Noujaimie felt an object in Vega's waistband. [(DUF 14.)] Defendant Noujaimie formed reasonable suspicion that Vega contained a potential dangerous object and conducted a further search. (*Id.*)
>
> . . . Defendant Noujaimie conducted a further search of Vega's groin area when he had reasonable [suspicion] that Vega had an object in his waist band area. Lastly, Defendants Vega and Noujaimie took Vega to the low dose scanner to confirm Vega had no contraband on his person. The clothed body search was for a penological purpose.
>
> . . . Vega testified that Defendant Noujamie was not aggressive and merely cupped Vega's genitals. (DUF 16.) Vega also testified that he did not hear what Defendant Borba said to Defendant Noujaimie. (DUF 15.) Lt. Guthery also concluded that Defendant Noujaimie's search complied with department policy, and Vega's allegations were unfounded. (*Id.*) There is no evidence that Defendant Borba ordered Noujaimie to grab or squeeze Vega's genitals Noujaimie's search was compliant with DOM 52050.16.5[.]
>
> Defendant Noujaimie's search occurred June 24, 2021. (DUF 13.) Vega's protected conduct occurred on February 4, 2021, when he filed a grievance (VSP-A-50294). (DUF 11) The alleged a[d]verse action occurred one hundred and forty days after the protected conduct. Vega also cannot establish any fact establishing that Noujaimie's conduct was motivated by any protected conduct. Vega cannot establish any causal link between his protected action and Defendant Noujaimie's pat down search of Vega.

(*Id.*).

The day after the search, June 25, 2021, Plaintiff filed a grievance (VSP-C-1333244) alleging that Noujaime grabbed his genitals.

On July 29, 2021, ISU conducted a search of Plaintiff's cell, with all Defendants

9

participating in this search. (ECF No. 134-5, p. 4). They explain the basis of this search as follows:

> In this case, the search was initiated by the ISU's discovery of cell phones in the Plant Operations area where Vega worked and had access. (DUF 18.) Supervisor Herroz informed Defendant Soto that Vega insisted on reporting to work despite being informed he is not needed. (DUF 20.) Defendants Borba, Noujaimie and Soto conducted a search of the cells of each inmate that was assigned to Plant Operations and could have had access to the cart. (DUF 17.) On July 27, 2021, Vega was assigned to Plant Operations, and therefore had access to the cart. (*Id.*) Inmate Robles also confirmed that his cell was searched because he was assigned to landscaping. (DUF 29.) Furthermore, when the Defendants searched Vega's cell, they searched the property and performed unclothed body searches of all eight inmates, not just Vega. (DUF 17.) The search was initiated to locate contraband and not for any retaliatory purpose.

(ECF No. 134-1, p. 18).

### 2. RVR, ASU, and Transfer

The parties agree that Plaintiff was issued an RVR for, and ultimately found guilty of, constructive possession of a cell phone, that Plaintiff was placed in ASU, and that Plaintiff was ultimately transferred to a different facility. The parties' central dispute is whether these actions were retaliatory.

Regarding these events, Defendants argue as follows:

> The issuance of the August 12, 2021, RVR for constructive possession of a cell phone was in furtherance of the same legitimate correctional goal as the July 29, 2021 search. (DUF 21.) Defendant Soto issued the August 12, 2021, RVR for constructive possession of a cell phone in violation of Title 15 § 3006, based upon an investigation into the cell phones discovered at the Vector Control on July 27, 2021. (*Id.*) After speaking to several witnesses, Defendant Soto concluded that Vega orchestrated the introduction of the cell phones. (DUF 20.) Defendant Soto's filing of that August 12, 2021 RVR furthered the general legitimate penological interests intended by Title 15 § 3006(c)(a), by preventing inmates from having monitored contact with people outside the prison, using communication devices to facilitate other unlawful activities.
>
> . . . .
>
> Vega's ASU placement was due to concern for Vega's safety and the security of the institution. Vega was initially placed in ASU because there was a potential enemy safety concern. Once ISU confirmed a confidential enemy situation did exist, Vega was referred to ICC to be housed in another facility. During the course of the investigation, Soto verified that Vega had an enemy/safety concern at VSP. (DUF 24, 25.) Soto's decision to place Vega in Administrative Segregation was due to safety concerns and not for any retaliatory purpose.

(ECF No. 134-1, pp. 19, 22).

Upon review of Defendants' evidence, the Court concludes that Defendants have met their initial burden of identifying evidence that demonstrates the absence of a genuine issue of material fact. Specifically, they have presented evidence that the searches of Plaintiff's cell and person, the RVR proceedings, his placement in ASU, and his eventual transfer were all related to legitimate penological goals rather than based on retaliation—namely, the investigation of cell phones at VSP and concerns for Plaintiff's safety.

Accordingly, the Court will now turn to Plaintiff's opposition to determine whether he has designated specific facts demonstrating the existence of genuine issues for trial.

### B. Plaintiff's Evidence

Plaintiff disputes that Defendants took the actions at issue based on legitimate penological goals. Rather, he states that they knew he had nothing to do with the introduction of cell phones at VSP and instead retaliated against him based on the grievances he filed against them.

In support of his argument, Plaintiff relies on the timing of events, noting that the events at issue happened in relatively short periods after he filed his grievances. (ECF No. 139, p. 7, 12). Specifically, after Plaintiff filed his grievance about Borba breaking his charger in October 2020, his cell was searched approximately five times between October and February 2021.[4] And after Plaintiff complained about the searches in February 2021, he was subjected to a search in June 2021 where Noujaime grabbed his genitals, placed in ASU in July 2021, and charged with constructive possession of a cell phone in August 2021.

The Court recognizes Defendants' argument that, because they purportedly would not have been notified of the grievance concerning Borba breaking Plaintiff's battery charger, they could not have retaliated against him on this basis. (ECF No. 134-1, p. 16 – "A staff member will not be notified that a grievance was made against them unless they are interviewed. Defendants would not have been immediately notified that Vega filed a grievance against them. The Defendants would not have been aware of inmate grievances when they conducted their

---

[4] The Court recognizes Defendants' contention, which Plaintiff does not appear to dispute, that "the first search occurred before Vega even filed his first grievance." (ECF No. 134-1, p. 13). However, assuming this is true, it does not negate the reasonable inference that the remaining searches were retaliatory based on their timing and for the other reasons discussed.

investigations.") (internal citation omitted). However, this argument ignores evidence in the record. Notably, Borba's own declaration states as follows: "On N[o]vember 24, 2020, I was interviewed regarding Vega's grievance . . . alleging that I broke a battery charger while searching Vega's cell." (ECF No. 134-3, p. 2). Accordingly, this is undisputed evidence that, at least Borba did in fact know that Plaintiff filed a grievance against him before some of the alleged retaliatory actions.

Moreover, Plaintiff has submitted additional evidence that Defendants knew about his grievances and took adverse action against him based on such complaints. Plaintiff's verified complaint states as follows:

> On July 29, 2021 Defendant Soto informed Plaintiff that he was going to set him up with fake confidentials to justify placing him in Ad-Seg for filing grievances and PREA charges against his staffs. Then he would file a fake RVR and have him shipped away from his family. Defendant Soto informed Plaintiff that he could make all this go away, if he give up any staff member for contrabands. Plaintiff stated I have no information.
>
> On July 29, 2021 Defendants Borba and Noujaime both agreed by the shaking of their head that nobody here is going to say anything difference on what Defendant Soto said in re: of setting Plaintiff up and we got your back, stated Defendant Borba. Defendant Borba stated "we going to get him" and Defendants Borba and Noujaime started mocking Plaintiff on writing the previous 602's and Defendant Borba stated no one is going to believe you when we set your ass up, and Defendant Noujaime started giving Plaintiff 602's forms.

(ECF No. 14, p. 8).

Plaintiff's deposition transcript also supports his argument that Defendants retaliated against him. Notably, Plaintiff recounts a conversation before he was placed in ASU where Soto revealed his intentions to retaliate:

> What I'm saying is he was blatant, like calling me a bitch, a piece of shit, a rat for telling on his officers. Before I could even ask the question as far as does this have anything to do with the 602, he said, "Goddamn right this has everything to do with you writing up my staff, and this is what your punk ass gets."

(ECF No. 134-2, p. 50).

Further, Plaintiff testified about similar comments from Defendants:

> Being that [Soto] said, "You're writing up my staff," I took it that he was talking about Noujamie and Borba, and being that they later on were offering 602s in a mocking form, when they're already saying, "We're going to send you to the hole, ship you off away from your family," at that time they said Donovan for doing this, and then they literally went one by one -- I know this sounds so -- it sounds so

> cliche, but this is the situation I've always heard about but never been in exactly, but they literally went one by one.
>
> Soto was like, "Are you going to say something? Are you going to say something? Are you going to say something?"
>
> Each one was like "No. No. No. No."
>
> And at that point he's like, "Nobody is going to believe your story. You're fucked."

(*Id.* at 51).

And Plaintiff testified that he "was placed in a cage in [the] ISU holding office" and "[t]hat's when Soto gave [Plaintiff] a way out of the whole situation. He said that he could make the fake confidentials go away if [Plaintiff] give him something in return, which he indicated he wanted his staff implicated." (*Id.* at 53). Generally, Plaintiff testified that Soto wanted information about staff bringing in contraband, and Soto said that he would not set Plaintiff up for the RVR by using fake confidential informants to say that he was responsible for the introduction of cell phones if Plaintiff provided such information. (*Id.* at 53-54).

Additionally, Plaintiff indicates that during the July 2021 search of his cell, Nojamie and Borba taunted him with statements indicating that they knew he had complained about the previous search of his person where his genitalia was grabbed.

> A. At that point in time they made statements like, "You can't complain now about us – about genitalia" because they had stripped me. They pat searched me, and they were just making fun of me.
>
> Q. So they said, "Now you can't complain" --
>
> A. About genitalia popping out or popping out, and because they had me stripped naked. They had me stripped down.

(*Id.* at 47).

And regarding the search of his person, Plaintiff strongly disputes Defendants' contention that his genitalia was not grabbed, noting that this characterization of his deposition testimony is inaccurate. (ECF No. 139, p. 3). At his deposition, Plaintiff testified that correctional officers can put their hands close to the genitalia "but they're not necessarily supposed to touch it." (ECF No. 134-2, p. 35). For the specific incident at issue he testified, in part, as follows:

> So for the most part, it was normal when it came to the above area, but once [Noujamie] came to my waistline, he grabbed what I would call my -- I would say the bulge of my genitalia, and then immediately asked me, "What is this." You

13

> could tell -- see – if you see my 602 he says -- I say, "possible sexual" because even then, I wasn't understanding what was going on.
>
> But he did grab my genitalia a couple times, and he went back and he had a sidebar conversation with Sergeant Borba, which I don't know what the conversation was about. He came back. He kept asking me this time -- not aggressive. I want to say it was more like trying to find out "What do you have? What do you have? What do you have?"
>
> That's when he was grabbing my genitalia, and I kept telling him time after time it was just me. He was just touching me."

(*Id.* at 36-37).[5]

Plaintiff also provides the deposition transcript of Jonathan Miller, an inmate who witnessed this search, who testified as follows:

> [Noujamie] started patting you [Plaintiff] down from your shoulders to your arms, and then he got to your waistband and he stuck his hand in your -- the waistband of your pants, and at that point where I seen a -- a strange look on your face as I would call it. And then Officer Noujaime asked you if you have anything on you, what is that on you. And -- and you answered him something to the effect of, I don't -- I don't have anything. That's – that's, forgive my language, but that's my penis.

(ECF No. 139, p. 78).

Additionally, Plaintiff cites the deposition transcript of another inmate, Javier Robles, who asserts that he was the one responsible for the introduction of the cell phones and Soto and Borba tried to intimidate him into implicating Plaintiff. (ECF No. 139, p. 4). He testified, in part, as follows:

> The -- well, they -- I had a couple inmates that worked outside with me. Because I came in a little bit more early, I was informed that they had found -- they found cell phones in my boss's cart, my other co-workers outside the gate. Once I found out about that, I got everything out of my cell before -- the night before they came. They came about 3:00 a.m. bum rushing my cell looking for cell phones or any type of ties to tie me to that. And they kept threatening me we know it's you, come on, like, you know. I'm, like, I don't know what you're talking about. Obviously I'm in prison; I'm not going to be admitting to anything. It's just – it's just messed up that when you can't get somebody, you'd rather get somebody else.

(ECF No. 134-2, pp. 169-70).

When asked whether Defendants ever brought up Plaintiff's grievances, Robles responded as follows:

---

[5] While Defendants correctly point out that Plaintiff, at one point, says his genitals were "cupped," they ignore the many portions of his testimony refer to his genitals as being grabbed. (ECF No. 134-1, p. 17).

14

> Well, they [later clarified to be Soto and Borba in this incident] brought up, you know, Vega has a PREA case against me. Like, they made comments and said things. Like, they wanted me to assist them and will, like – they would make things go away. And I said make things go away? You don't have nothing. Like, what are you talking about?

(*Id.* at 171).

Upon review of Plaintiff's evidence, which must be believed at this stage, with all justifiable inferences also being drawn in his favor, the Court concludes that a jury could reasonably render a verdict in his favor. *See Anderson*, 477 U.S. at 255 (noting that, at the summary judgment stage, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor"). Notably, Plaintiff has presented evidence that contradicts Defendants' narrative that all the actions at issue were taken for legitimate penological reasons rather than to retaliate against Plaintiff.

Importantly, Plaintiff's submitted evidence indicates that Defendants knew about the grievances against them before they took adverse actions against Plaintiff. Moreover, Plaintiff has presented his own testimony and that of another inmate suggesting that the search of his person was more than a routine pat-down; rather, Noujaime touched his genitals in an inappropriate manner. Moreover, Plaintiff has submitted evidence that Defendants themselves stated that they were retaliating against him due to Plaintiff's grievances against them. Namely, Defendants stated that they were undertaking their actions based on Plaintiff's grievances, were otherwise trying to pressure him to identify staff members behind the introduction of contraband, and were trying to pressure Robles to implicate Plaintiff. Further, the context of these events indicate that they knew Plaintiff was innocent of the RVR.

The Court recognizes that—as to the RVR issue—Defendants cite cases for the proposition that a prisoner cannot prevail on a retaliation claim where he was afforded due process and there was some evidence to support the finding. (ECF No. 134-1, p. 20, citing among other cases, *O'Bryant v. Finch*, 637 F.3d 1207 (11th Cir. 2011)). The Court declines to recommend granting summary judgment based on this argument.

As Defendants note, "none of these cases arise in this Circuit"; thus, they are not binding on the Court. (ECF No. 134-1, p. 20). Moreover, Plaintiff's claims here are for retaliation, not due process violations, and courts within this Circuit have concluded that a plaintiff can maintain a

15

retaliation claim even if he otherwise received due process. *See Hines v. Gomez*, 108 F.3d 265, 269 (9th Cir. 1997) ("[T]his court has reaffirmed that prisoners may still base retaliation claims on harms that would not raise due process concerns."); *Witkin v. Cook*, No. 2:20-CV-2355 JAM DB P, 2022 WL 958526, at *3 (E.D. Cal. Feb. 17, 2022), *report and recommendation adopted*, 2022 WL 956996 (E.D. Cal. Mar. 30, 2022) (declining to dismiss retaliation claim where the plaintiff was found guilty of disobeying an order); *Hunter v. Haar*, No. CV 14-9886 R(JC), 2018 WL 6113098, at *10 (C.D. Cal. July 19, 2018), *report and recommendation adopted*, 2018 WL 6118555 (C.D. Cal. Aug. 27, 2018) (noting that the some evidence standard that is typically used in connection with due process challenges to prison disciplinary proceedings does not apply to retaliation claims).

For the above reasons, the Court recommends that Defendants' motion for summary judgment be denied because Plaintiff has submitted evidence from which a jury could reasonably render a verdict in his favor.

### C. Qualified Immunity

Defendants also argue that they are entitled to qualified immunity on Plaintiff's retaliation claims. (ECF No. 134-1, pp. 22-24). Plaintiff argues that they are not entitled to qualified immunity. (ECF No. 139, pp. 12-13).

Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231.

In determining whether an officer is entitled to qualified immunity, the Court must decide (1) whether facts alleged or shown by plaintiff make out a violation of constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct. *Pearson*, 555 U.S. at 232 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Courts are

16

"permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. In resolving these issues, the Court must view the evidence in the light most favorable to the plaintiff and resolve all material factual disputes in favor of the plaintiff. *Martinez v. Stanford*, 323 F.3d 1178, 1184 (9th Cir. 2003).

As to qualified immunity, Defendants argue as follows:

> As described above, VSP was experiencing an influx of contraband cellphones, and the investigation of the source was ongoing. A reasonable officer performed essential functions of their jobs in furtherance of that investigation and pursuant to prison policy, would not know their conduct was unconstitutional simply because the plaintiff had filed grievances related to the investigation. The Defendants conducted each search because they had suspicion, which eventually proved true, that Vega was in possession of cell phones.
>
> The Defendants search of Vega's cell, based upon the investigation into cell phones, was therefore inherently reasonable. Similarly, Defendant Soto issued the August 21, 2021, RVR in furtherance of a legitimate correctional goal. Soto issued the August 21, 2021, RVR in furtherance of his duties as a correctional sergeant and in order to enforce Title 15 of the California Code of Regulations. The Defendants searches were to identify contraband, specifically cell phones.
>
> Lastly, Defendant Soto concluded Vega had an enemy safety concern. Defendant Soto's investigation into the cell phones discovered on July 27, 2021, revealed that Vega had an enemy/safety concern at VSP, and he needed to be placed in Administrative Segregation because his presence in the general population was deemed a threat to the safety and security of the institution, and to Vega. [It] is clear the Defendants acted in furtherance of Vega's safety.
>
> Because all the allegedly retaliatory conduct was in furtherance of legitimate correctional goals, Defendants are entitled to immunity from damages under this doctrine.

(ECF No. 134-1, pp. 23-24) (cited legal argument and authority omitted).

This version of events improperly considers only Defendants' evidence and such evidence in a light most favorable to them.

As explained above, the Court must view the evidence in the light most favorable to Plaintiff, and in doing so, has already concluded that he presents genuine issues of material fact regarding whether Defendants retaliated against him. Under such a view, the appropriate question would be whether, as of 2020, the law was clearly established that correctional officers are not permitted to repeatedly search Plaintiff's cell, grab his genitalia, file a false RVR against him,

1    place him in ASU, and transfer him because he filed grievances against them.

2    Plaintiff cites *Rhodes* in support of his argument that the law clearly established the

3    illegality of such conduct. (ECF No. 139, p. 13). In *Rhodes*, the Ninth Circuit concluded as

4    follows: "[W]e must first reiterate our firm recognition that the prohibition against retaliatory

5    punishment is clearly established law in the Ninth Circuit, for qualified immunity purposes."

6    *Rhodes*, 408 F.3d at 569. In *Rhodes*, the plaintiff, among other things, alleged that officers

7    "threatened to transfer him to another correctional institution" based on his filing grievances. *Id.*

8    at 568. Notably here, Plaintiff alleges that he was transferred, among other adverse actions, for

9    filing a grievance.

10    Defendants' reply appears to argue that *Rhodes* is insufficient for the clearly-established

11    prong of qualified immunity because not all of the alleged retaliatory actions here were also at

     issue in *Rhodes*:

12    
> Vega does not point to any binding legal authority that would alert reasonable
13    > officials that their conduct would be retaliatory. Instead, Vega merely cites to
     > authority that officials may not engage in retaliatory conduct. However, Vega has
14    > failed to provide any authority establishing that the Defendants conduct would in
     > fact be unconstitutional. This is insufficient, and Defendants are entitled to
15    > qualified immunity.

16    (ECF No. 142, p. 8).

17    However, this argument ignores the relevant legal standards. Importantly, the Supreme

18    Court has noted that the clearly-established prong does "not require a case directly on point,";

19    rather, "existing precedent must have placed the statutory or constitutional question beyond

20    debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Other courts have relied on *Rhodes*

21    regarding retaliatory acts that were not directly at issue in *Rhodes*. *See, e.g., Herrera v. Ortega*,

22    No. 20-CV-02035 BLF, 2023 WL 7597572, at *8 (N.D. Cal. Nov. 14, 2023) (citing *Rhodes* and

23    concluding as follows, "Viewing the evidence in the light most favorable to Plaintiff, Defendants

24    are alleged to have conducted a retaliatory cell search in response to Plaintiff's refusal to

25    withdraw an inmate grievance. At the time of this alleged conduct, it was sufficiently clear that

26    every reasonable official would have understood that he may not take adverse action against an

27    inmate for exercising his First Amendment rights, including filing inmate grievances."); *Ahmed v.

28    Ringler*, No. 2:13-CV-1050 MCE DAD, 2015 WL 502855, at *8 (E.D. Cal. Feb. 5, 2015), *report*

*and recommendation adopted*, 2015 WL 1119675 (E.D. Cal. Mar. 11, 2015) (citing *Rhodes* and concluding as follows, "Any reasonable prison official in defendant Ringler's position would have known that retaliating against plaintiff with unnecessary cell searches because plaintiff had filed formal inmate grievances against him would be a violation of the First Amendment."); *McMillan v. Ringler*, No. 2:13-CV-00578-MCE KJN P, 2014 WL 7335318, at *16 (E.D. Cal. Dec. 19, 2014), *report and recommendation adopted*, 2015 WL 640716 (E.D. Cal. Feb. 13, 2015) ("Defendants again argue that they did not violate plaintiff's constitutional rights, as the challenged actions, including cell searches, the 128–B Chrono, and plaintiff's placement in administrative segregation, were all permissible actions under California law. Defendants fail to acknowledge the 'firm recognition that the prohibition against retaliatory punishment is 'clearly established law' in the Ninth Circuit, for qualified immunity purposes.' *Rhodes*, 408 F.3d at 569 (internal quotations omitted). The fact that the challenged actions may have been otherwise legal does not mean that they could be undertaken with an impermissible retaliatory intent.").

Moreover, authority outside of *Rhodes*, which deals with some of the other retaliatory acts at issue here, likewise serves as clearly established law. *See Shepard v. Quillen*, 840 F.3d 686, 694 (9th Cir. 2016) (concluding that prison official was not entitled to qualified immunity in connection with claim that prisoner was placed in administrative segregation for reporting officer misconduct); *Young v. Moreno*, No. CV 10-9699-JST SH, 2012 WL 1836088, at *6 (C.D. Cal. May 8, 2012), *report and recommendation adopted*, 2012 WL 1835631 (C.D. Cal. May 17, 2012) ("A reasonable official would know that moving an inmate to administrative segregation and filing a RVR without any cause would be a violation of an inmate's clearly established rights."); *Schwenk v. Hartford*, 204 F.3d 1187, 1197 (9th Cir. 2000) ("Where guards themselves are responsible for the rape and sexual abuse of inmates, qualified immunity offers no shield. . . . In the simplest and most absolute of terms, the Eighth Amendment right of prisoners to be free from sexual abuse was unquestionably clearly established prior to the time of this alleged assault, and no reasonable prison guard could possibly have believed otherwise."); *Rizzo v. Dawson*, 778 F.2d 527, 531 (9th Cir. 1985) (concluding that prison officials could not transfer a prisoner to another prison in retaliation for pursuing legal actions).

Based on the above authority, the Court recommends finding that Defendants are not

entitled to qualified immunity because it was clearly established that their alleged conduct in this case would violate Plaintiff's right under the First Amendment to be free from retaliation.

## VII. CONCLUSION AND RECOMMENDATIONS

Accordingly, for the above reasons, IT IS RECOMMENDED that Defendants' motion for summary judgment (ECF No. 134) be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within thirty (30) days after being served with these findings and recommendations, any party may file written objections with the Court. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any objections shall be limited to no more than fifteen (15) pages, including exhibits. Any reply to the objections shall be served and filed within fourteen (14) days after service of the objections. The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: **February 20, 2025**          /s/ Erica P. Grosjean
                                      UNITED STATES MAGISTRATE JUDGE